IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

MICHAEL GROOVER,        :

      Plaintiff,                  Case No. 3:25-cv-152

      v.                          :        Judge Walter H. Rice

KETTERING TRANS.
SERVS., LLC,

                                    :

      Defendants.

---

DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY
JUDGMENT OF DEFENDANT KETTERING TRANSPORT SERVICES,
LLC (DOC. #26); JUDGMENT TO ENTER IN FAVOR OF DEFENDANT
AND AGAINST PLAINTIFF MICHAEL GROOVER; TERMINATION
ENTRY

---

Before the Court is the Motion for Summary Judgment of Defendant

Kettering Transportation Services, LLC ("Defendant" or "KTS"). (Doc. #26). For

the reasons set forth below, the Motion is SUSTAINED.

## I.    Factual Background and Procedural History

At the summary judgment stage, the facts are viewed and inferences are

resolved in the light most favorable to Plaintiff as the non-moving party.

*Washington v. Newsom*, 977 F.2d 991, 996 (6th Cir. 1992). Plaintiff Michael

Groover, an African-American male, began his employment with KTS's

predecessor company in 2019, and continued to work as a Communications

Assistant working night shift continuously after KTS assumed operations. (Pltf.

Dep., Doc. #18, PAGEID 102, 103). In late 2021 or early 2022, Defendant promoted James ("Jim") Reynolds[1], a Caucasian male, to serve as Communications Manager and, consequently, as Plaintiff's supervisor. (J. Reynolds Dep., Doc. #22, PAGEID 427). Reynolds, in turn, reported to Robert Kidd, III, a Caucasian male and Defendant's Operations Director. (R. Kidd Dep., Doc. #20, PAGEID 250; Doc. #22, PAGEID 439). During his employment, Groover claims that he was consistently targeted by his coworkers due to his race, and that his supervisor Ennis Conyers, a Black Puerto Rican-American, told Plaintiff that "he should just quit" if he could not handle the racially-hostile environment. (Memo. in Opp., Doc. #27, PAGEID 619-20, citing Doc. #18, PAGEID 100, 101, 105, 112, 115, 116-17; Doc. #22, PAGEID 433). Groover states that he consistently complained "to Defendant's Human Resources, Kidd, Ennis and his other supervisor Chuck Reynolds that he was being treated differently by his co-workers due to his race." (*Id.* at PAGEID 620, citing Doc. #18, PAGEID 151-53). During a February 2024 meeting between Plaintiff and Reynolds, Plaintiff again complained of racial discrimination; despite promising to talk to human resources on Plaintiff's behalf, Reynolds never did. (*Id.*, citing Doc. #20, PAGEID 265; Doc. #22, PAGEID 430, 431, 432, 442; Doc. #22-21, PAGEID 585).[2]

---

[1] All subsequent references to "Reynolds" are to James Reynolds, unless otherwise specified.

[2] Plaintiff gave inconsistent testimony as to whether he brought up race-based discrimination to Reynolds. (*Compare* Doc. #18, PAGEID 156 (stating that he did use the word "race" in the February 2024 complaint) *with id.* at PAGEID 117(stating that he could not recall specifically whether he conveyed to Reynolds his belief that the hostile treatment was race-based)). At the summary judgment stage, the Court must resolve this ambiguity in favor of Plaintiff. *Anderson v.*

From August 2022 through March 2024, Plaintiff was assessed five warnings for violations of Defendant's attendance policy. (Doc. #22-6, PAGEID 501-02; Doc. #22-7, PAGEID 503-04; Doc. #22-8, PAGEID 505-06; Doc. #22-11, PAGEID 511-12; Doc. #22-12, PAGEID 513-14; Doc. #22-13, PAGEID 515-16). By March 2024, Plaintiff had accumulated 7.5 attendance "occurrences" within the previous twelve months, as specified in Defendant's discipline policy, which resulted in a final written warning. (Doc. #22-13, PAGEID 515-16). Plaintiff argues that he should not have been assessed the 0.5 occurrences each for leaving early on July 18 and 25, 2023, and on November 16 and 20, 2023, as he left on those days due to the workplace's racially-hostile environment. (Doc. #27, PAGEID 620-21, citing Doc. #18, PAGEID 143; Doc. #20-14, PAGEID 344; Doc. #22-13, PAGEID 513-14).

On April 22, 2024, Plaintiff called off work again, bringing his total occurrences to 8.5, above the 8.0 occurrence threshold for termination, and Jim Reynolds made the decision to terminate Plaintiff on April 25, 2024. (Doc. #22, PAGEID 42; Doc. #22-13, PAGEID 515-16). After Plaintiff's termination, Defendant hired two white communication assistants to replace him.[3] (Doc. #27, PAGEID

---

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, it is only complaints that Plaintiff made to Reynolds that are relevant, since Plaintiff concedes that he has not raised a claim for hostile work environment. (Doc. #27, PAGEID 631 n.1).

[3] Defendant argues that Plaintiff's "position – including his job duties and his shift – was given to Joy Blackburn, another African-American employee of KTS." (Doc. #26, PAGEID 605, citing Doc. #20, PAGEID 283-87). For the purposes of this Motion, the Court must construe this factual dispute in favor of Plaintiff. *Anderson*, 477 U.S. at 255. However, for the reasons set forth below, the race of Plaintiff's replacement has no bearing on the outcome.

621, citing Doc. #22, PAGEID 462; Doc. #22-19, PAGEID 557).  Plaintiff appealed Reynolds's decision to Kidd via letter, wherein he stated that he "previously had spoken to HR representatives about the issues I have been dealing with at work." (Doc. #18-1, PAGEID 172).  However, he stated that the reason for his termination was "for points that I have acquired from calling off or leaving work early." (*Id.*). His letter focused on the validity of three of his occurrences, a "he said he said" issue of whether he was singled out in the office because nobody liked him, and his belief that at least one other employee attempted to make him the only KTS employee answering calls between 1:30 a.m. and 4:30 a.m. on his shifts. (Doc. #18-1, PAGEID 172).  Plaintiff concedes that he did not raise with Kidd his belief that Plaintiff's discipline and termination were racially motivated, as he "thought it would be something else for them to use as justification as [*sic*] not to rehire me." (Doc. #18, PAGEID 141).  On May 15, 2024, Kidd denied Plaintiff's appeal, after a review of call logs and transport requests while Plaintiff was on duty, and after interviewing several KTS employees and concluding that they were more credible than Plaintiff. (Doc. #18-4, PAGEID 186-87).  Kidd also stated that Plaintiff "acknowledged that [he] left [work] due to being required to answer calls and complete call aheads." (*Id.* at PAGEID 187).

On May 8, 2025, Plaintiff filed the Complaint, alleging that Defendant discriminated against him in his employment and termination therefrom based on his African-American race, in violation of Title VII of the Civil Rights Act of 1964 (Claim One) and Ohio civil rights law. (Claim Two). (Doc. #1, PAGEID 9-10, ¶¶ 133-

4

50, citing 42 U.S.C. § 2000(e); OHIO REV. CODE § 4112.02(A), *et seq.*). Plaintiff also alleges that Defendant retaliated against him by not excusing absences and ultimately terminating him in response to Plaintiff's protected conduct of complaining of racial discrimination on the job, also in violation of Title VII and Ohio law. (*Id.* at PAGEID 10-11, ¶¶ 151-60, citing 42 U.S.C. § 2000(e); OHIO REV. CODE § 4112.02(A), *et seq.*).

On March 16, 2026, Defendant filed the instant Motion, arguing that Plaintiff cannot meet his *prima facie* burden on Claims One and Two, racial discrimination, because he cannot show that he was otherwise qualified for the position. (Doc. #26, PAGEID 608-09, citing *Wingo v. Mich. Bell Tel. Co.*, 815 F. App'x 43,45 (6th Cir. 2020)). Specifically, Defendant claims that Plaintiff's repeated unapproved absences meant that Plaintiff was not "performing his job 'at a level which met his employer's legitimate expectations.'" (*Id.* at PAGEID 609, quoting *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990), *holding limited by Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003)). "KTS's Conduct and Discipline Policy clearly set forth the attendance requirements for successful employment at KTS, and clearly articulates that these are mandatory requirements that must be met in order to be qualified for continued employment. Plaintiff concedes that he failed to meet this threshold qualification." (*Id.*).

Defendant further asserts that, even if Plaintiff could meet his *prima facie* burden, he does not contest Defendant's proffered, nondiscriminatory reason for discipline and termination, and he cannot establish pretext, because Plaintiff

5

cannot "show that: (1) KTS's stated reason for his termination has no basis in fact; (2) the reasons did not actually motivate KTS; or (3) the proffered reasons were not sufficient to warrant the action." (Doc. #26, PAGEID 610, citing *Finch v. Xavier Univ.*, 689 F. Supp. 2d 955, 963 (S.D. Ohio 2010) (Beckwith, J.)).

As to Claims Three and Four Defendant argues that Plaintiff cannot meet his *prima facie* burden for retaliatory termination, for two reasons. (Doc. #26, PAGEID 614, citing 42 U.S.C. § 2000e-3; *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). *First*, Defendant claims that Plaintiff did not engage in protected activity, as the latter's complaints to Reynolds and Kidd centered on "various management practices in his workplace, and about the unfriendly conduct of some of his coworkers. At no point did he make a complaint about any specific act or omission that he identified as race-based." (*Id.* at PAGEID 615). *Second*, Plaintiff was issued numerous warnings for his attendance violations both before and after his complaints to Reynolds, human resources, and others; thus, Defendant argues, even if Plaintiff had engaged in protected activity, he cannot establish a causal link between that activity and the issuance of occurrences and warnings that, pursuant to Defendant's progressive discipline policy, culminated in his April 2024 termination. (*Id.* at PAGEID 615-16).

In his memorandum *contra*, Plaintiff argues that several times during his employment, he made complaints to management about race-based discrimination. (Memo. in Opp., Doc. #27, PAGEID 622-23, citing Doc. #18, PAGEID 151-53, 156; Doc. #22, PAGEID 430, 431, 432, 442). In Plaintiff's most

6

recent complaint in February 2024, Plaintiff specifically told Reynolds that he (Plaintiff) believed his "[B]lack skin" was the reason he was being treated differently. (*Id.* at PAGEID 623, citing Doc. #22-21, PAGEID 585). Plaintiff claims that, because only two months elapsed between his most recent race-based complaint to Reynolds and termination by Reynolds, there is a plausible causal connection between Plaintiff's protected activity and the adverse employment action. (*Id.* at PAGEID 623-25). Thus, Plaintiff concludes, he has met his modest *prima facie* burden on his retaliation claims. (*Id.* at PAGEID 624, 625, citing *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000); *Grubbs v. Delphi Auto. Sys., LLC*, 11th Dist. Trumbull No. 2017-T-0097, 2018-Ohio-2352, ¶ 41 (Jun. 18, 2018).)

As to Claims One and Two, Plaintiff argues that it is undisputed that he is a member of a protected class and that he suffered an adverse employment action. He also claims there is no evidence that Plaintiff was unqualified for the position, as Plaintiff was never subject to discipline during his nearly five years working for Defendant. (Doc. #27, PAGEID 626). Plaintiff further asserts that Defendant's argument that Plaintiff's absences rendered him unqualified for the position is legally unsupported. (*Id.* at PAGEID 626-27). Moreover, he argues that "there is *at the very least a question of fact* of who actually replaced Groover" (*id.* at PAGEID 627 (emphasis in original)), and whether the person or persons who replaced him is Caucasian. Thus, Plaintiff concludes, he has made a *prima facie* case of employment discrimination. (*Id.*). As to pretext, Plaintiff argues that the issuance

7

of occurrences are discretionary, meaning that, had Reynolds decided to excuse even some of Plaintiff's absences, Plaintiff would not have been terminated pursuant to Defendant's progressive discipline policy. (*Id.* at PAGEID 629-30, citing Doc. #22, PAGEID 463). Plaintiff testified that Kidd informed him that even reaching 8.0 occurrences, as Plaintiff did, does not automatically result in termination; the difference, Plaintiff argues, between treatment of other delinquent employees and himself is his history of race-based complaints. (*Id.* at PAGEID 630, citing Doc. #18, PAGEID 143-44). "Therefore," Plaintiff concludes, "questions of fact remain regarding whether Defendant's 'attendance' excuse (a) is based on facts, (b) actually motivated Groover's termination or (c) warranted termination even if true." (*Id.*).

In Reply, Defendant notes that Plaintiff's sole basis for his contention that accumulating 8.0 occurrences is not grounds for automatic termination was a meeting Kidd supposedly had with Plaintiff and other employees several months before his termination. (Doc. #29, PAGEID 709-11, quoting Doc. #18, PAGEID 143-44). Defendant claims that Plaintiff's testimony is irrelevant, because it was Reynolds, not Kidd, who made the termination decision, and Reynolds testified that, if an employee had 8.0 occurrences within twelve months, he always terminated them. (*Id.* at PAGEID 711-12, quoting Doc. #22, PAGEID 436-37). Moreover, Defendant asserts that any failure of Reynolds issuing occurrences for Plaintiff leaving early on the four instances, even if discretionary, is not actionable. Defendant argues that Plaintiff testified that his reasons for leaving were based on

8

work allocation during his shifts, but he never asserted that the work allocation was racially-motivated. (*Id.* at PAGEID 712-13, citing Doc. #18, PAGEID 120-21).

The matter is now ripe for decision.

## II.     Legal Standards

### A.     Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986).  Rule 56 "requires the nonmoving party to go beyond the pleadings," and present some type of evidentiary material in support of its position.  *Celotex*, 477 U.S. at 324.  "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."  *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

"Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party.  *Id.* at 255.  If the parties present conflicting evidence, a court may not decide which evidence to believe.  Credibility determinations must be left to the fact-finder.  10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE CIVIL § 2726 (3d ed. 1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties.  FED.R.CIV.P. 56(c)(3).  "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."  *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).  If it so chooses, however, the court may also consider other properly presented materials in the record.  FED.R.CIV.P. 56(c)(3).

10

### B.      Employment Discrimination and Retaliation

A plaintiff may produce evidence of employment discrimination under the direct or indirect evidence approach  Plaintiff's claims are based on indirect evidence of racial discrimination and retaliation by Defendants, meaning that the well-established *McDonnell Douglas* "burden-shifting" framework applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Tepper v. Potter*, 505 F.3d 508, 515-16 (6th Cir. 2007), *overruled on other grounds by E.E.O.C. v. Abercrombie & Fitch Co.*, 575 U.S. 768 (2015).  Employment discrimination and retaliation claims arising under Ohio Rev. Code § 4112.02 *et seq.* and relying on indirect evidence of discrimination follow the same burden-shifting analysis.  *Coryell v. Bank One Trust Co., N.A.*, 101 Ohio St. 3d 175, 2004-Ohio-723, ¶ 9; *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St. 3d 578, 582 (1996).

For racial discrimination in termination, a plaintiff employee must make a *prima facie* showing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he is qualified for position; and (4) he was replaced by someone outside the protected class or was treated differently than similarly-situated employees.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).  If the plaintiff makes such a showing, then the burden shifts to the defendant employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action" it undertook.  *Tepper*, 505 F.3d at 515, citing *McDonnell Douglas*, 411 U.S. at 802.  "If the defendant meets this burden, then the burden shifts back to the plaintiff[,] who must show that the defendant's

11

proffered reason is a pretext for discrimination." *Id.* at 515-16, citing *McDonnell Douglas*, 411 U.S. at 804.  However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff *remains at all times with the plaintiff.*"  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (emphasis added).

Pretext may be shown "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994) (brackets in original), quoting *Burdine*, 450 U.S. at 256, *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).  "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).  "To carry her burden in opposing summary judgment, [a plaintiff] must produce sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her." *Id.*; *accord: Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014), quoting *Chen*, 580 F.3d at 400 ("At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.").

For retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) the defendant employer knew of the activity; (3) the defendant thereafter subjected the plaintiff to an adverse employment action; and (4) there is a causal connection between the protected activity and adverse action. *Montell*, 757 F.3d at 504. "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen* 229 F.3d at 563. At the summary judgment stage, "all facts must be viewed in the light most favorable to [the plaintiff] and all reasonable inferences must be made in her favor" with respect to the *prima facie* case. *Montell*, 757 F.3d at 505. The second and third stages of the burden-shifting analysis are the same as those for discrimination. *Montell*, 757 F.3d at 504. As with discrimination, retaliation claims arising under Ohio law and Title VII are analyzed identically using the above burden-shifting framework. *Moody v. Ohio Dep't of Mental Health & Addiction Servs.*, 2021-Ohio-4578, ¶¶ 35-36, 183 N.E.3d 21 (10th Dist.).

## III.    Analysis

While the parties disagree over whether Plaintiff can make a *prima facie* case for discrimination or retaliation, Plaintiff does not dispute that Defendant has met its burden at stage two—*i.e.*, that Plaintiff accumulating at least 8.0 attendance occurrences within twelve months was a legitimate, nondiscriminatory reason for termination. (Doc. #27, PAGEID 627-28). Thus, the burden shifts back to Plaintiff to show pretext, which he cannot do even at the summary judgment stage. Consequently, his claims fail as matters of law.

13

As discussed above, Plaintiff may show pretext by presenting a genuine issue of material fact that Defendant's proffered, nondiscriminatory reason: (a) was factually baseless; (b) did not actually motivate Defendant; or (c) the proffered reason was insufficient to warrant Defendant terminating Plaintiff. *Chen*, 580 F.3d at 400. Plaintiff does not dispute that: (1) he was aware of Defendant's progressive discipline policy, including that incurring 8.0 occurrences in a twelve-month period was grounds for termination; (2) he actually did call off work or leave work early on days for which he was assessed occurrences; or that (3) he received progressive discipline, including termination, at the correct number of occurrences. (Doc. #18, PAGEID 146; Doc. #18-5, PAGEID 188-89; Doc. #18-6, PAGEID 190-96; Doc. #26, PAGEID 602). Thus, Plaintiff cannot meet his burden to show that Defendant's proffered reason was factually baseless.

Plaintiff advances three arguments for the "did not actually motivate" and "insufficient reasons" categories. *First*, he claims that, because Reynolds could have elected not to assess occurrences on days when Plaintiff left work early, there is an issue of material fact as to whether Reynolds's decision *to* assess occurrences was based on racial or retaliatory animus. (Doc. #27, PAGEID 629-30, citing Doc. #22, PAGEID 438, 463). In his testimony, Reynolds conceded that he did not "always give people half an occurrence when they left early, even if it was because they were sick or [had] some family emergency[.]" (Doc. #22, PAGEID 438). However, Reynolds did not testify that the decision as to whether to assess the 0.5 occurrence for leaving early was *wholly* discretionary, and no reasonable

14

reading of that section Defendant's conduct and discipline handbook (Doc. #18-6, PAGEID 193) permits such an inference.

Moreover, while Plaintiff was assessed occurrences for instances when he called off or left early due to illness, those all occurred prior to August 1, 2022 (Doc. #22-7, PAGEID 503); as those occurrences happened more than twelve months prior to his termination, they did not count toward the 8.0 occurrences when Reynolds terminated him. (*See* Doc. #22-13, PAGEID 515 (occurrences began on July 18, 2023, and go through April 22, 2024)).  Also, the example Plaintiff cites of Reynolds having discretion in a non-illness or family emergency situation is Reynolds testifying that an employee may not be subject to discipline if he or she justifiably *clocked out late*. (Doc. #22, PAGEID 463).  Such an infraction is different in kind than calling off or leaving early; consequently, any discretion Reynolds may have is not sufficient reason to doubt Defendant's proffered reason for termination.  *Chen*, 580 F.3d at 400.

*Second*, as discussed above, Plaintiff argues that four instances between July and November 2023, in which he left work early and was assessed a total of 2.0 occurrences, should not have been counted, because he left work on those days to avoid the racist treatment from his coworkers that Defendant had been unwilling or unable to eliminate.  "Had Reynolds excused Groover leaving work early (like he did for other employees) instead of giving him a point, Groover *would not have been terminated*. **This fact is undisputed**." (Doc #27, PAGEID 629-30 (emphasis in original)).  Plaintiff, by his own admission, "did not plead a

15

hostile work environment claim[.]" (*Id.* at PAGEID 631 n.1).  Thus, the Court's analysis is confined to Reynolds's decision to terminate him.  Moreover, Plaintiff does not identify any instance in which he expressly made *Reynolds* aware of racially discriminatory treatment by his coworkers until February 2024—several months after he received the occurrences.  (Doc. #27, PAGEID 620, citing Doc. #22-21, PAGEID 585).  Moreover, there is no evidence that Plaintiff made ever Reynolds aware that racially hostile or discriminatory treatment was Plaintiff's reason for leaving work early on those days, or that Plaintiff asked Reynolds to rescind the 2.0 occurrences for that reason.  Thus, even assuming that racial animus was the reason for *Plaintiff* leaving work early, there is no evidence that *Reynolds* was acting pretextually in assessing otherwise-valid 0.5 occurrences on those days.

*Third*, Plaintiff testified that Kidd told him in a meeting that "not all people get terminated at eight points" (Doc. #18, PAGEID 143-44), and, thus, argues that Plaintiff merely reaching 8.0 occurrences was insufficient to warrant termination. (Doc. #27, PAGEID 630).  Plaintiff's relaying of Kidd's purported statement is an out-of-court assertion made by another being offered for the truth of the matter asserted—in other words, textbook hearsay, FED.R.EVID. 801(c)—and "[h]earsay evidence may not be considered on summary judgment." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir.1999).  However, even assuming *arguendo* that Kidd was acting in an official capacity in that meeting, such that the party-opponent exclusion to the hearsay rule applies to

16

Kidd's statement, FED.R.EVID. 801(d)(2), Defendant is correct that Kidd's statement is irrelevant in this case. (Doc. #29, PAGEID 711). It was Reynolds, not Kidd, who made the decision to terminate Plaintiff for reaching 8.0 occurrences, and Reynolds testified that he always followed Defendant's progressive discipline policy, which always led to termination if an employee received 8.0 occurrences within a twelve-month period. [4] (Doc. #22, PAGEID 437). Reynolds, in terminating Plaintiff and any other employee who reached 8.0 occurrences in that span, adhered to Defendant's conduct and discipline policy directing him to do precisely that. (Doc. #18-6, PAGEID 194). Thus, Defendant's proffered, nondiscriminatory reason was sufficient to motivate its termination of Plaintiff.

As failure to set forth a material issue of fact on pretext is fatal to Plaintiff's federal and Ohio discrimination and retaliation claims, Claims One through Four must be dismissed in their entireties.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. #26) is SUSTAINED. Judgment shall enter in favor of Defendant and against Plaintiff on all claims.

---

[4] While Kidd oversaw Plaintiff's appeal and upheld Plaintiff's termination (Doc. #18-4, PAGEID 186-87), Plaintiff, in his appeal letter, did not raise racial animus or discrimination as a reason for why he left work early in July and November 2023 or as a contributor to the "hostile environment that my co- workers were creating." (Doc. #18-1, PAGEID 172). Rather, Plaintiff stated that "I was told by one of my co-workers I get left alone" to answer all incoming calls, along with his other job duties, "because no one likes me in the office." In other words, Plaintiff framed the hostility of his coworkers as motivated by personality differences, rather than race-based animus.

The captioned case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.


IT IS SO ORDERED.

WALTER H. RICE, JUDGE
UNITED STATES DISTRICT COURT

June 25, 2026